Michael J. Brennan
James P. Connor
Kevin Guerrero
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
202-551-8394 (Connor)
connorja@sec.gov (Connor)
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>          v.<br><br>MARC S. SCHESSEL and SCWORX CORP.,<br>                              Defendants. | 2:22-cv-03287 (____)<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") [100 F Street, N.E., Washington, DC 20549] for its Complaint against Defendants SCWorx Corporation ("SCWorx" or the "Company") [590 Madison Avenue New York, NY 10022] and Marc S. Schessel ("Schessel") [4 Jacobs Lane, New Paltz, NY 12561], alleges as follows:

## SUMMARY

1.      In April 2020, during the outbreak of the coronavirus disease 2019 ("COVID-19") pandemic, NASDAQ-listed securities issuer SCWorx Corp. (ticker:

WORX) and its Chief Executive Officer, Schessel, issued false and misleading press releases and other statements claiming that SCWorx would supply millions of COVID-19 test kits to an online healthcare company based in Fairfield, New Jersey ("Telehealth Company"), in exchange for hundreds of millions of dollars. In reality, not only was there was no agreement for SCWorx to provide COVID-19 test kits to Telehealth Company, SCWorx did not even have a legitimate supplier for the COVID-19 test kits.

2.      Defendants' false and misleading statements to investors began on April 13, 2020, when SCWorx issued a press release falsely stating that it had a "committed purchase order" from Telehealth Company to provide two million COVID-19 test kits "with provision for additional weekly orders of two million units for 23 weeks, valued at $35 million per week" – totaling $840 million. Following the press release, SCWorx's stock price surged more than 425 percent to close at $12.02, up from $2.25 at the close of the prior trading day, on volume of approximately 96.2 million shares, more than 900 times the stock's prior three-month average daily volume.

3.      The press release did not state who would supply SCWorx with the test kits, but included a link to the website of the supposed supplier of test kits, Supplier Company, an Australia-based entity that purportedly sold "advanced sports and aesthetic medical equipment."

4.      Schessel and SCWorx knew or were reckless in not knowing two critical facts:  (1) there was no "committed purchase order" or purchase agreement between SCWorx and Telehealth Company; and (2) Supplier Company was not a legitimate supplier for the COVID-19 test kits that SCWorx would supposedly provide to Telehealth Company.

5.      On April 14, 2020, the day after the press release was issued, counsel for Telehealth Company notified Schessel and SCWorx in writing that the "committed purchase order" that Defendants had touted in the press release was actually a "preliminary summary draft" and that the "parties have not yet agreed upon and reduced to writing numerous material terms[.]"  In fact, SCWorx and Telehealth Company had not even executed a purchase agreement, under which any binding purchase order would then be issued.

6.      Nonetheless, Schessel repeated the false and misleading statements from the press release – and made additional false and misleading statements – on a call with SCWorx investors on April 15, 2020, in a report filed with the Commission on April 16, 2020, and in a SCWorx press release issued on April 17, 2020.  Schessel's additional false and misleading statements included telling investors that Supplier Company's supposed COVID-19 test kit "had the proper F[ood] [and] D[rug] A[dministration] authorizations under the emergency authorization act," despite the fact that he knew or was reckless in not knowing

3

that the Supplier Company's COVID-19 test kits did not have the proper U.S. Food and Drug Administration ("FDA") emergency use authorization ("EUA").[1]

7.     SCWorx and Schessel benefitted from the massive surge in SCWorx's stock price.  For example, SCWorx issued shares to satisfy a large debt to an SCWorx vendor while the stock price was inflated due to the false and misleading statements by SCWorx and Schessel.  As Schessel explained in an April 14, 2020 email to SCWorx's Board of Directors, "now that the stock has increased in value[,] we can actually pay the entire [vendor debt] with the stock," which was a "homerun for the company" and an "amazing development that we have worked on getting [i]n position for."

8.     On April 30, 2020, before delivering a single COVID-19 test kit, SCWorx reported in a public SEC filing that the "committed" purchase order touted in its press releases had been "terminated" and that its agreement with Supplier Company, the supposed COVID-19 test kit supplier, was also "terminated."

---

[1] An EUA is a mechanism the FDA uses to facilitate the availability and use of medical countermeasures, including test kits, during public health emergencies, such as the current COVID-19 pandemic. *Emergency Use Authorization*, U.S. Food and Drug Administration, https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization (last visited May 30, 2022).

4

9.      Through their conduct, SCWorx and Schessel violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], as well as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Unless restrained and enjoined, Defendants will continue to violate these provisions and are likely to engage in future violations of the federal securities laws.

## JURISDICTION AND VENUE

10.      The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

11.      The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.      Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

13.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78a(a)] because certain of the offers and sales of securities and certain of the

acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within this District.  Specifically, venue is proper because (1) investors within this District purchased SCWorx stock during the period of April 13, 2020 through April 20, 2020; (2) Defendants' false and misleading press releases and other misstatements were available to investors within this District; (3) Telehealth Company, the supposed counterparty to the multi-million dollar "committed purchase order" referenced in SCWorx's false and misleading press releases and other statements, is based in Fairfield, New Jersey.

## DEFENDANTS

14.     **Marc S. Schessel**, age 62, resides in New Paltz, New York.  In February 2019, Schessel became the Chief Executive Officer of SCWorx and the Chairman of SCWorx's Board of Directors.  He resigned as CEO in January 2021 and was removed from the Board of Directors in May 2021.  Schessel continues to work for SCWorx in a consulting role.  In August 2003, Defendant Schessel pled guilty to felony tax evasion in New York State Court.

15.     **SCWorx Corp.** is a Delaware corporation with a principal office in New York, New York.  SCWorx describes itself as a software-as-a-service provider for those in the healthcare industry.  On February 1, 2019, SCWorx reverse merged into Alliance MMA Inc., an operator of a regional mixed martial arts production business.  Shares of SCWorx common stock are registered with the

Commission pursuant to Section 12(b) of the Exchange Act and trade on the

Nasdaq Capital Market under the symbol "WORX."  The Commission temporarily

suspended trading in the securities of SCWorx from April 22, 2020 until May 5,

2020, due to concerns about "the adequacy and accuracy of publicly available

information in the marketplace."  The Nasdaq Capital Market halted trading in

SCWorx's common stock from May 5, 2020, until August 10, 2020.

## FACTUAL ALLEGATIONS

**I.    SCWorx's Perilous Financial Condition Leading Up To Defendants'
       False And Misleading Press Releases**

16.    Since its inception in February 2019, SCWorx has struggled to turn a

profit.  For the year ended December 31, 2019, the Company reported a net loss of

$11,312,500, on revenues of $5,548,119, and had less than $500,000 in cash.

17.    By March 2020, SCWorx's financial situation was getting worse.  In

its report for the first quarterly period of 2020, SCWorx disclosed that it "has

suffered recurring losses from operations and incurred a net loss of $1,149,651 for

the three months ended March 31, 2020."  The Company reported that, as of March

31, 2020, it had cash of $201,092, a working deficit of $2,521,580, and an

accumulated deficit of $13,944,124.  SCWorx also disclosed "substantial doubt

about the Company's ability to continue as a going concern within one year[.]"

## II.     SCWorx And Schessel Seized Upon the COVID-19 Pandemic

18.    In March 2020, the same month the World Health Organization declared the Covid-19 outbreak a global pandemic, Schessel came under increasing pressure from large SCWorx shareholders to raise the stock price and improve SCWorx's financial condition.  On March 15, 2020, one of SCWorx's largest shareholders, and an informal advisor to Schessel, emailed Schessel, stating that the Company could not carry monthly losses of $200,000 for very long and suggesting that staff furloughs might be necessary.

19.    On March 17, 2020, that same shareholder emailed Schessel:  "maybe we need something in the market??  a must … the stock needs a boost for sure … it[']s a real issue now."

20.    Just three days later, on March 20, 2020, SCWorx issued a press release announcing that it had formed a wholly-owned subsidiary, Direct-Worx, LLC, to sell urgently needed personal protective equipment to the healthcare industry, claiming that the Company's access to supply chain data made it uniquely capable of meeting such demands.  The press release quoted Schessel as saying: "SCWorx is experiencing a strong influx of recurring revenue streams, which should drive improved results during these difficult times."  The press release also stated that Direct-Worx "is now working with more than 1,000 hospitals, state

municipalities, and foreign governments in the sourcing and delivery of these incredibly hard to find items."

21.     One week later, Defendants announced Direct-Worx's first purported deal in a March 27, 2020 press release entitled: "SCWorx Subsidiary Direct Worx Sources One Million Surgical Masks for Existing Large Hospital Customer to Help Maintain Safety for Healthcare Providers Treating Patients Affected By COVID-19 Pandemic."  The announcement did not identify the hospital customer, but stated that it had an agreement to supply one million surgical masks for $390,000. The release again touted the Company's ability to rapidly secure the urgently needed hospital supplies, "positioning us for accelerated growth as a leader in this space," and indicating that the Company expected to announce "similar agreements as the pandemic spreads."

22.     Within days, Defendants began making announcements about the supposed COVID-19 test kit deal giving rise to the present action.

**III.    Defendants Issued Multiple False and Misleading Press Releases And Made Other Misstatements And Omissions Touting A Massive COVID-19 Test Kit Deal**

23.     On or around April 3, 2020, an individual with whom SCWorx was working to find suppliers of protective equipment for the healthcare industry (the "Consultant") first emailed Supplier Company about a potential order for COVID-19 test kits.  The Consultant wrote:

> We [SCWorx] are placing an order with a distributor for
> your test kits.  We represent 400 Hospitals and several
> State purchasers.  The order is for over 25MM [million]
> units.  Could you please confirm who your licensed
> representatives are.  As part of our order, we are
> proposing to have a government plane pick up the kits in
> Australia.

24.     On April 9, 2020, before entering into any agreement with Supplier

Company, Schessel received an unsigned one-page purchase order, purportedly

from Telehealth Company, for 2 million COVID-19 rapid test kits at $17.50, for a

total of $35,000,000, with a "revolving order for the next 6 months," and "weekly

delivery of 2MM pieces," for a total of "48MM pieces."  Schessel received the

purchase order through an online invoice software program, with a transmittal

email which stated that, "You have received a purchase order from [Telehealth

Company] for $35,000,000."  The purchase order transmittal listed an email

address for the Consultant, who also had a familial relationship with a senior

executive at Telehealth Company.

25.     The following day, April 10, 2020, SCWorx entered into a three-page

agreement with Supplier Company – a company with no experience in diagnostic

testing – under which SCWorx agreed to purchase 52 million COVID-19 rapid test

kits from Supplier Company for $676 million.  SCWorx had never entered into a

transaction near this size; the largest announced deal it had ever entered into before

was valued at $4.6 million.  SCWorx did not have the funds to pay for even the first installment of test kits.

26.     To make matters worse, Supplier Company was not a legitimate supplier of the COVID-19 rapid test kits that SCWorx claimed Supplier Company would provide.

27.     On February 29, 2020, FDA publicly issued on its website (www.fda.gov) its "Policy for Diagnostics Testing in Laboratories Certified to Perform High-Complexity Testing under Clinical Laboratory Improvement Amendments prior to Emergency Use Authorization for Coronavirus Disease-2019 during the Public Health Emergency," which was later revised on March 16, 2020 (then titled "Policy for Diagnostic Tests for Coronavirus Disease-2019 during the Public Health Emergency: Guidance for Clinical Laboratories, Commercial Manufacturers, and Food and Drug Administration Staff") (referred to as the "FDA Guidance").

28.     The FDA Guidance included a section (section IV.D) that detailed "Commercial Manufacturer Development and Distribution and Laboratory Development and Use of Serology Tests[2] Without an EUA."  The FDA Guidance

---

[2]  Serology tests, or antibody tests, look for antibodies in a patient's immune system produced in response to SARS-CoV-2, the virus that causes COVID-19. *Coronavirus Disease 2019 Testing Basics*, U.S. Food and Drug Administration https://www.fda.gov/consumers/consumer-updates/coronavirus-disease-2019-testing-basics (last visited May 30, 2022).

stated that the FDA "does not intend to object to the development and distribution by commercial manufacturers or development and use by laboratories of serology tests to identify antibodies to SARS-CoV-2, where the test has been validated, notification is provided to FDA," and certain information was provided in the test reports. The FDA maintained a list on its public website that included commercial manufacturers that had provided notification of this test validation to the FDA.

29.     The FDA's website initially listed "[Supplier Company] COVID-19 Rapid Test [Chinese manufacturer] SARS-CoV-2 Antibody Test (Lateral Flow Method)" – *i.e.*, the test that Defendants claimed SCWorx would provide to Telehealth Company – as one of the tests for which notification and test validation was submitted to the FDA. But on April 11, 2020, two days before Defendants' issued their first press release, the FDA rescinded that notification and removed the test from its site. The FDA rescinded the notification and removed the COVID-19 test kit from its website because the Chinese manufacturer of the test kit had not authorized Supplier Company to promote, sell, or distribute the test kit that Supplier Company had submitted to the FDA for notification.[3]

_____

[3] In May 2020, the Australian Government's Therapeutic Goods Administration ("TGA") fined Supplier Company for "claim[ing] or impl[ying] on its website and via social media that the TGA and the United States Food and Drug Administration (FDA) had endorsed or approved a COVID-19 Rapid Test kit." The Australian Government further concluded that Supplier Company "does not have a COVID-19 Rapid test kit" and ordered it to "immediately remove all advertising it is

30.     In fact, the Chinese manufacturer issued a public statement on April 5, 2020 – more than a week before SCWorx's press release was issued – stating that "[Supplier Company] is NOT an authorized representative nor distributor" of the COVID-19 test kits "in Australia, America, or any other countries[.]"  The FDA also notified Supplier Company on April 12, 2020 that it was not "allowed to distribute the [COVID-19 test kit] in the U.S[.]"

### A.     The April 13, 2020 False And Misleading SCWorx Press Release

31.      Before the market opened on April 13, 2020, SCWorx issued a press release announcing that it had received a "committed purchase order" from Telehealth Company for two million COVID-19 test kits, with "provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week," for a total of $840 million.

32.     The April 13 press release stated that SCWorx would supply Telehealth Company with COVID-19 rapid detection kits, which test for the presence of antibodies that can be detected in samples from patients infected with the coronavirus (SARS-CoV-2) that causes COVID-19.  According to Schessel, who was quoted in the release, the committed purchase order would "significantly increase the availability of rapid-test kits in the United States."

---

responsible for in relation to COVID-19 Rapid test kits" from Supplier Company's website and social media accounts.

33.     Schessel made the sole and ultimate decision to issue the April 13 press release, had final editorial control and ultimate authority over the content of the press release, assisted in drafting the press release, quoted himself in the release, authorized its issuance, and is listed as the SCWorx contact for the release.

34.     The April 13 press release issued by SCWorx and Schessel was false and misleading in several material ways:

- First, Schessel knew, or was reckless in not knowing, that there was no "committed purchase order" between Telehealth Company and SCWorx.  The parties never entered into a purchase agreement under which any binding purchase order would be issued.  In fact, Telehealth's Chief Executive Officer testified that the purchase order was merely a preliminary summary draft.

- Second, Schessel knew, or was reckless in not knowing, that the April 13 press release was misleading by omission, because it failed to disclose that SCWorx did not have an executed purchase agreement with Telehealth Company, and several material terms – including provisions addressing scheduling, shipping, delivery, payment, default, and termination – had not been negotiated between the parties.  By not disclosing those material facts, Schessel's statements in the press release were rendered materially misleading.

- Third, Schessel knew, or was reckless in not knowing, that Supplier Company was not a legitimate supplier of COVID-19 test kits, could not import their purported COVID-19 test kits to the United States, and certainly could not provide two million tests per week for 23 weeks, as the press release falsely stated.

35.     On April 14, 2020, the day after the press release was issued, counsel for Telehealth Company notified Schessel and SCWorx in writing that the "committed purchase order" that Defendants had touted in the press release was

14

actually a "preliminary summary draft" and that the "parties have not yet agreed upon and reduced to writing numerous material terms, including, but not limited to, commencement date, scheduling, delivery instructions, payment terms, default provisions, and termination provisions." Telehealth's counsel made clear that "as of April 9, 2020 – the Purchase Order date – neither SCWorx nor [Telehealth Company] had completed due diligence related to the contemplated series of complex and sophisticated future transactions." Telehealth's counsel even notified Defendants that, "[h]ad [Telehealth Company] been consulted, it would not have approved of the SCWorx Press Release," and that it "expressly requests that SCWorx omit from mentioning [Telehealth Company] in any future press releases or other public communications without obtaining [Telehealth Company's] consent."

36.     On April 14, 2020, a day *after* SCWorx had issued a press release indicating that Supplier Company would imminently provide millions of COVID-19 tests for distribution in the United States, Supplier Company submitted notification to the FDA that Supplier Company would distribute a *different* COVID-19 test kit than the test that had previously appeared on the FDA's website. Supplier Company did not complete the notification process for the new COVID-19 test kit under the FDA Guidance until April 28, 2020, weeks *after* SCWorx's false and misleading press releases.

**B.      Schessel's False And Misleading Statements To Investors on April 15, 2020**

37.     Despite the fact that they knew or were reckless in not knowing that SCWorx had no agreement to provide COVID-19 test kits to Telehealth Company and no means to obtain COVID-19 test kits, SCWorx and Schessel convened a "business update" call with investors on April 15, 2020 to repeat the same false and misleading statements from the April 13 press release.

38.      On that April 15 call, Schessel again falsely stated that SCWorx had a "committed purchase order from [Telehealth Company], a U.S.-based telemedicine healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35 million per week."

39.     Schessel also falsely told investors that he "spent weeks researching over 30 product different lines, distributors, intermediaries until I found an actual manufacturer that had a kit that appeared to me at least to have all the attributes I was looking for – which were a very high sensitivity rating to blood samples, had the proper FDA authorizations under the emergency authorization act, was not a Chinese or South Korean manufacturer, was well on its way towards getting full FDA clearance and had enough capacity on his line where I could purchase 25% of his capacity with options to grow that over time."

40.     Schessel knew, or was reckless in not knowing, that Supplier Company's test kits did not have "the proper FDA authorizations" and had no EUA.  He also knew, or was reckless in not knowing, that Supplier Company was not "well on its way towards getting full FDA clearance," given that (1) Supplier Company's COVID-19 test kit had no EUA, (2) Supplier Company had been marketing a COVID-19 test kit without the manufacturer's consent, (3) the test kit had been removed from the FDA's website four days earlier; and (4) Supplier Company had submitted a different COVID-19 test kit to the FDA for notification under the FDA Guidance just a day prior.  And the actual manufacturer of the test kit that once appeared on FDA's website (and that Supplier Company was previously marketing without authorization) *was* a Chinese manufacturer, contrary to what Schessel told investors.

41.     Schessel then falsely told investors that SCWorx would be "splitting up [the SCWorx—Telehealth Company] contract" due to the "incredible demand for these kits."  When he made these statements, Schessel knew or was reckless in not knowing that there was no "contract" between SCWorx and Telehealth Company.

## C.     Schessel's False And Misleading Statements In An April 16, 2020 SEC Filing

42.     On April 16, 2020, Defendants continued to tout their deal to sell COVID-19 test kits, filing a report on Form 8-K with the SEC for "Entry into A

17

Material Definitive Agreement," which stated for the first time that the purported

supplier of the COVID-19 test kits was Supplier Company.[4]

43.    The Form 8-K, which was signed by Schessel, again stated that

SCWorx had accepted a purchase order from Telehealth Company, under which it

had ordered, and SCWorx was "required to deliver," two million test kits, "with

provision for additional weekly orders of two million units for 23 weeks (a total of

48 million units)."

44.    These statements were false and misleading, because as Schessel

knew or was reckless in not knowing, SCWorx did not have an agreement with

Telehealth Company, and Supplier Company was not a legitimate supplier of

COVID-19 test kits to SCWorx.

**D.    Market Participants Raise Questions And Defendants Double
Down With Another False and Misleading Press Release**

45.     On April 17, 2020, a research firm that engages in short selling of

stocks published an online report characterizing the "committed purchase order"

announced in SCWorx's April 13, 2020 press release as "completely bogus."  The

report pointed out that Supplier Company was marketing a Chinese company's test

kit without authorization (a fact Defendants already knew or were reckless in not

knowing) and that Schessel had been convicted of felony tax evasion in the United

---

[4] The April 13, 2020 press release linked to the website of Supplier Company
but did not state that it was the COVID-19 test kit supplier.

States, and further raised questions about the ability of Telehealth Company, which had three employees, to purchase hundreds of millions of COVID-19 test kits.  The research report prompted additional questions to Schessel, SCWorx, and its investor relations firm regarding the veracity of the claims in the April 13, 2020 press release.

46.     Instead of admitting that its prior press release was false and misleading, Defendants doubled down by issuing another false and misleading press release to the investing public.

47.     Specifically, on April 17, 2020, Defendants issued a second press release "announcing today that it confirms previously disclosed plans to distribute COVID-19 Rapid Testing Units," again falsely stating that it had a "committed purchase order" with Telehealth Company to provide "two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week."

48.     Schessel made the sole and ultimate decision to issue the April 17, 2020 press release, had final editorial control and ultimate authority over the content of the press release, assisted in drafting the press release, authorized its issuance, and is listed as the SCWorx contact for the release.

49.     Three days later, on April 20, 2020, Telehealth Company again notified SCWorx and Schessel that there was "no committed purchase order" and

demanded that SCWorx stop "using [Telehealth Company's] name in public filings and [SCWorx]-issued press releases relating to any such potential transactions."

### E. The Commission Suspends Trading In SCWorx, And SCWorx Abandons Its Supposed Test Kit Deal

50.     On April 21, 2020, the Commission ordered the suspension of trading in SCWorx securities effective April 22 due to "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace concerning SCWorx including (1) press releases and other publicly disseminated statements, since at least April 13, 2020, about SCWorx's agreement to sell COVID-19 tests, and (2) SCWorx's current report on Form 8-K filed on April 16, 2020, concerning SCWorx's agreement to sell COVID-19 tests."

51.     On April 29, 2020, SCWorx terminated its agreement with Supplier Company, without purchasing any test kits.

52.     The next day, SCWorx filed a report on Form 8-K with the Commission stating that "substantial concerns" arose pertaining to Supplier Company's ability to supply test kits under their agreement.  Specifically, SCWorx expressed concern about Supplier Company's ability to "secure the requisite FDA approvals to permit the sale of its test kits in the US."  SCWorx also stated that Telehealth Company had terminated the purported "committed" purchase order.

53.     SCWorx never purchased any test kits from Supplier Company and never sold test kits to Telehealth Company, as it claimed it would in the April 13 and April 17, 2020 press releases.

## IV.    Defendants' False And Misleading Press Releases And Statements Dramatically Increased SCWorx's Stock Price And Volume

54.     Defendants' false and misleading statements related to the purported COVID-19 "committed purchase order" were material and greatly affected SCWorx's stock price and volume.

55.     For example, on the day of the misleading April 13, 2020 press release, SCWorx's stock price surged to $14.88 from a previous close of $2.25, before ending the day's trading up 425% at $12.02 on volume of 96.2 million shares, more than 900 times the prior three-month average daily volume.

## V.    Defendants Cashed In On The False And Misleading Press Releases And Other False and Misleading Statements

56.     SCWorx, Schessel, and a large SCWorx shareholder with ties to Schessel took quick advantage of the massive surge in SCWorx's stock price caused by Defendants' false and misleading statements.  In particular, on April 16, 2020, while the stock price was inflated due to Defendants' false and misleading statements, SCWorx issued 100,000 shares to satisfy a large debt to an SCWorx vendor.  As Schessel explained in an April 14, 2020 email to SCWorx's Board of Directors when it approved the issuance, "now that the stock has increased in

21

value[,] we can actually pay the entire [vendor debt] with the stock," which was a "homerun for the company" and an "amazing development that we have worked on getting [i]n position for."

57.    A large SCWorx shareholder who was an informal advisor to Schessel also sold a large amount of shares in the wake of the false and misleading April 13, 2020 press release, realizing large profits.  This was the same shareholder who had emailed Schessel just a month earlier that "maybe we need something in the market??  a must … the stock needs a boost for sure … it[']s a real issue now."

58.    Realizing that selling shares immediately after the false and misleading press release could draw unwanted attention, Schessel implored the shareholder "please don't sell anything" hours after the April 13, 2020 press release was issued, advice that the shareholder ignored.

59.    Schessel also executed trades of SCWorx's stock in the account of a family member on April 17, 2020, while the stock was inflated due to Schessel's false and misleading statements to investors.

## FIRST CLAIM FOR RELIEF
### (Schessel and SCWorx)
### Violations of Section 17(a) of the Securities Act

60.    The Commission re-alleges and incorporates paragraphs 1 through 59 as if fully set forth herein.

61.     By engaging in the conduct described above, Defendants Schessel and SCWorx, using the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, directly or indirectly, with scienter or negligently, employed devices, schemes, or artifices to defraud; obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in transactions, practices, or courses of dealing which operated or would operate as a fraud or deceit upon the purchaser.

62.     By reason of the actions alleged herein, Schessel and SCWorx violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and, unless restrained and enjoined, will continue to do so.

## SECOND CLAIM FOR RELIEF
### (Schessel and SCWorx)
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

63.     The Commission re-alleges and incorporates paragraphs 1 through 59 as if fully set forth herein.

64.     By engaging in the conduct described above, Schessel and SCWorx, with scienter, by use of the means or instrumentalities of interstate commerce, in connection with the purchase or sale of a security, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of

23

material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made,

not misleading; and/or (c) engaged in acts, practices or courses of conduct which

operated or would operate as a fraud or deceit.

65.    By reason of the actions alleged herein, Schessel and SCWorx

violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5] and unless restrained and enjoined will

continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a

judgment:

(i)    Finding that Schessel and SCWorx violated the provisions of the federal securities laws as alleged herein;

(ii)    Permanently restraining and enjoining Schessel and SCWorx from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act;

(iii)    Ordering Schessel and SCWorx to disgorge an amount equal to the proceeds of the conduct alleged herein, pursuant to Section 21(d)(5) and Section 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(7)] and to pay prejudgment interest thereon;

(iv)    Ordering Schessel and SCWorx to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)];

(v)    Ordering that Schessel be barred, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any

issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(vi)   Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the

Commission demands trial by jury in this action of all issues so triable.

Dated:  May 31, 2022                    Respectfully submitted,

*/s/ James P. Connor*
James P. Connor
Counsel for Plaintiff
United States Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549-4473
Telephone: 202-551-8394 (Connor)
Email:  connorja@sec.gov

Of counsel:
Michael J. Brennan
Kevin Guerrero
United States Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

25

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Rule 101.1(f), because Plaintiff Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as an alternative to the Commission to receive service of all notices or papers in the captioned action.  Therefore, service upon the United States Attorney's Office or its authorized designee:

> David E. Dauenheimer
> Deputy Chief, Government Fraud Unit
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, Suite 700
> Newark, NJ 07102-2534

shall constitute service upon the Commission for purposes of this action.

Dated:  May 31, 2022                    Respectfully submitted,

                                        */s/ James P. Connor*
                                        James P. Connor
                                        100 F Street, NE
                                        Washington, DC 20549-4473
                                        Telephone: 202-551-8394 (Connor)
                                        Email:  connorja@sec.gov

                                        COUNSEL FOR PLAINTIFF SECURITIES
                                        AND EXCHANGE COMMISSION